SHEPPARD MULLIN RICHTER & HAMPTON LLP
P. CRAIG CARDON, Cal. Bar No. 168646
KARI M. ROLLINS (admitted *pro hac vice*)
BENJAMIN O. AIGBOBOH, Cal. Bar No. 268531
ALYSSA M. SHAUER, Cal. Bar No. 318359
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone: 310.228.3700
Facsimile: 310.228.3701
Email: ccardon@sheppardmullin.com
krollins@sheppardmullin.com
baigboboh@sheppardmullin.com
ashauer@sheppardmullin.com

*Attorneys for Defendants*
DICK'S SPORTING GOODS, INC.;
THE TJX COMPANIES, INC.; and SEPHORA USA, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION**

| | |
|---|---|
| SHADI HAYDEN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THE RETAIL EQUATION, INC., *et al.*,<br><br>Defendants. | Case No. 8:20-cv-01203-JWH-DFM<br><br>[*Assigned to the Hon. John W. Holcomb*]<br><br>**DECLARATION OF BENJAMIN O. AIGBOBOH IN SUPPORT OF DEFENDANT SEPHORA USA, INC.'S INDIVIDUAL MOTION TO DISMISS**<br><br>**Hearing**<br>Date; March 19, 2021<br>Time: 9:00 a.m.<br>Courtroom: 2<br>Judge: Hon. John W. Holcomb<br><br>Complaint Filed: July 7, 2020<br>FAC Filed: August 3, 2020<br>Trial Date: None set |

# DECLARATION OF BENJAMIN O. AIGBOBOH

I, Benjamin O. Aigboboh, declare as follows:

1. I am an attorney duly admitted to practice before this Court. I am an associate with Sheppard Mullin Richter & Hampton LLP, attorneys of record for Defendant The Sephora USA, Inc.. If called as a witness, I could and would competently testify to all facts within my personal knowledge except where stated upon information and belief.

2. Attached hereto as **Exhibit A** is a true and correct copy of the June 25, 2018 California Bill Analysis for Assembly Bill 375 (CA B. An., A.B. 375 Sen., 6/25/2018), which was printed from the Westlaw database.

3. Attached hereto as **Exhibit B** are true and correct copies of portions of the California Office of Attorney General's ("**OAG**") June 1, 2020 *Final Statement of Reasons* regarding the California Consumer Privacy Act ("**CCPA**") and *Appendix A (Summary and Response to Comments Submitted during 45-Day Period)* thereto, which were printed from OAG's "CCPA Regulations" webpage available at the domain https://oag.ca.gov/privacy/ccpa/regs on November 23, 2020.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 30th day of November, 2020, at Monterey, California.

*[signature]*

Benjamin O. Aigboboh

SMRH:4821-9337-1090.1

-1-

# EXHIBIT A

Case 8:20-cv-01203-DOC-DFM  Document 148-1  Filed 11/30/20  Page 4 of 16  Page ID #:1108

California Bill Analysis, A.B. 375 Sen., 6/25/2018, California Bill Analysis, A.B. 375...

CA B. An., A.B. 375 Sen., 6/25/2018

California Bill Analysis, Assembly Floor, 2017-2018 Regular Session, Assembly Bill 375

June 25, 2018
California Senate
2017-2018 Regular Session

CONCURRENCE IN SENATE AMENDMENTS

AB 375 (Chau and Hertzberg)

As Amended June 25, 2018

Majority vote

ASSEMBLY:                    (May 11, 2017)                    SENATE:

(vote not relevant)

Original Committee Reference: **P. & C.P.**

**SUMMARY**: Effective January 1, 2020, this bill enacts the California Consumer Privacy Act of 2018 to ensure the privacy of Californians' personal information (PI) through various consumer rights including: the right to know what PI is being collected about them and whether their PI is being sold and to whom; the right to access their PI; the right to delete PI collected from them; the right to opt-out or opt-in to the sale of their PI, depending on age of the consumer; and the right to equal service and price, even if the consumer exercises the aforementioned rights.

**The Senate amendments** delete the prior version of this bill enacting the California Broadband Internet Privacy Act (which would have prohibited internet service providers from refusing to serve a customer, or charging a customer a penalty, if that customer did not consent to the use or sale of his or her PI) and insert provisions enacting the California Consumer Privacy Act, which, among other things:

1) Provides a consumer the right to request that a business that collects a consumer's PI disclose to that consumer the categories and specific pieces of PI the business has collected, no more than twice in a 12-month period, only upon receipt of a verifiable consumer request, as defined.

2) Provides consumers the right to request the deletion of personal information collected *from* the consumer, and requires businesses to comply with such requests.

3) Provides a consumer the right to request that a business that sells the consumer's PI, or that discloses it for a business purpose, disclose the following: a) the categories of PI that the business collected about the consumer; b) the categories of PI that the business sold about the consumer and the categories of third parties to whom the PI was sold, by category or categories of PI for each third party to whom the PI was sold; and c) the categories of PI that the business disclosed about the consumer for a business purpose.

4) Provides a consumer the right to request that a business that collects PI about the consumer disclose the following: a) the categories of PI it has collected about that consumer; b) the categories of sources from which the PI is collected; c) the business or commercial purpose for collecting or selling PI; d) the categories of third parties with whom the business shares PI; and e) the specific pieces of PI it has collected about that consumer.

5) Authorizes a consumer over the age of 16 to opt-out of the sale of PI by a business.

6) Prohibits a business from selling the PI of a consumer who less than 16 years of age, unless the consumer (or the consumer's parent for children under 13 years of age) opts in to the sale of that information.

7) Prohibits businesses from discriminating against a consumer for exercising his or her rights under this bill, such as by charging different prices or rates, or providing a different level or quality of goods or services. At the same time, authorizes businesses to offer financial incentives, including payments to consumers as compensation, for the collection, sale, or deletion of PI, as long as the financial incentive programs are not unjust, unreasonable, coercive, or usurious. Further authorizes a business to offer a different price, rate, level, or quality of goods or services to the consumer if that price or difference is directly related to the value provided to the consumer by the consumer's data. These authorizations are subject to specific notice requirements and conditioned upon the consumer providing prior opt-in consent, as specified, which may be revoked by the consumer at any time.

8) Provides for various exemptions from the bill, such as that the obligations imposed on businesses shall not restrict a business's ability to Comply with federal, state, or local laws; or exercise or defend legal claims.

9) Provides for enforcement of the bill by the Attorney General (AG), and otherwise creates a narrow private right action for consumers whose information is subject to specified security breaches, both of which are subject to a right to cure, if possible. Under the private of action, specifies that nothing in this bill shall be interpreted to serve as the basis for a private right of action under any other law. This shall not be construed to relieve any party from any duties or obligations imposed under other law or the United States or California Constitution.

10) Creates the Consumer Privacy Fund to support the purposes of this bill and its enforcement.

11) Require the AG to adopt regulations, and authorize a business, service provider, or third party to seek the AG's opinion on how to comply with the bill's provisions.

12) Includes a delayed implementation date of January 1, 2020, a preemption clause, and a severability clause, as specified.

13) Specifies that the bill shall become operative only if a specified initiative measure, measure No. 17-0039, The Consumer Right to Privacy Act of 2018, is withdrawn from the ballot pursuant to existing law.

14) Provides various definitions for these purposes, including that "PI" means: information that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. PI includes, but is not limited to, the following:
  a) Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.
  b) Any categories of PI described in Civil Code Section (CIV) 1798.80(e) (*see* Existing Law, below).
  c) Characteristics of protected classifications under California or federal law.
  d) Commercial information, as specified.
  e) Biometric information.
  f) Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement.
  g) Geolocation data.
  h) Audio, electronic, visual, thermal, olfactory, or similar information.
  i) Professional or employment-related information.

15) Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act.

16) Inferences drawn from any of the information identified in this subdivision to create a profile about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

17) "Personal information" excludes publicly available information. For these purposes, "publicly available" would mean information that is lawfully made available from federal, state, or local government records, if any conditions associated with such information. "Publicly available" does not include biometric information collected by a business about a consumer without the consumer's knowledge. Further, information is not be "publicly available" if that data is used for a purpose that is not compatible with the purpose for which the data is maintained and made available in the government records or for which it is publicly maintained. Lastly, "publicly available" excludes consumer information that is deidentified or aggregate consumer information.

18) Includes various findings and declarations.

**EXISTING LAW**:

1) Provides that, among other rights, all people have an inalienable right to pursue and obtain privacy. (California Constitution, Article I, Section 1.)

2) Establishes the information security law, which requires a business that owns, licenses, or maintains PI, as defined, about a California resident to implement and maintain "reasonable security procedures and practices appropriate to the nature of the information," to protect the PI from unauthorized access, destruction, use, modification, or disclosure. (CIV 1798.81.5(b).)

3) Further requires a business that discloses PI about a California resident pursuant to a contract with a nonaffiliated third party that is not subject to the above provision to require by contract that the third party implement and maintain "reasonable security procedures and practices appropriate to the nature of the information," to protect the PI from unauthorized access, destruction, use, modification, or disclosure. (CIV 1798.81.5(c).)

4) Defines personal information, for purposes of CIV 1798.80 and the state's data breach laws, generally, to mean: any information that identifies, relates to, describes, or is capable of being associated with, a particular individual, including, but not limited to, his or her name, signature, social security number, physical characteristics or description, address, telephone number, passport number, driver's license or state identification number, insurance policy number, education, employment, employment history, bank account number, credit card number, debit card number, or any other financial information, medical information, or health insurance information. "Personal information" for these purposes, does not include publicly available information that is lawfully made available to the general public from federal, state, or local government records. (CIV Section 1798.80(e).)

5) Requires, under the Privacy Rights for California Minors in the Digital World, that an operator of an internet website, online service, online application, or mobile application that is directed to minors or that has actual knowledge that a minor is using its internet website, online service, online application, or mobile application shall do all of the following:
   a) Permit a minor who is a registered user, as specified, to remove or, if the operator prefers, to request and obtain removal of, content or information posted on the operator's internet website, online service, online application, or mobile application by the user.
   b) Provide notice to a minor who is a registered user that the minor may remove or, if the operator prefers, request and obtain removal of, posted content or information, as specified.
   c) Provide clear instructions to a minor who is a registered user on how the user may remove or, if the operator prefers, request and obtain the removal of posted content or information.
   d) Provide notice to a minor who is a registered user that the removal does not ensure complete or comprehensive removal of the posted content or information. (Business and Professions Section (BPC) 22581(a).)

6) An operator or a third party is not required to erase or otherwise eliminate, or to enable erasure or elimination of, content or information in certain circumstances, such as where:

Case 8:20-cv-01203-DOC-DFM   Document 148-1   Filed 11/30/20   Page 7 of 16   Page ID #:1111

California Bill Analysis, A.B. 375 Sen., 6/25/2018, California Bill Analysis, A.B. 375...

  a) Any other provision of federal or state law requires the operator or third party to maintain the content or information.
  b) The content or information was stored on or posted to the operator's internet website, online service, online application, or mobile application by a third party other than the minor, who is a registered user, including any content or information posted by the registered user that was stored, republished, or reposted by the third party.
  c) The operator anonymizes the content or information posted by the minor who is a registered user, so that the minor cannot be individually identified.
  d) The minor has received compensation or other consideration for providing the content. (BPC 22581(b).)

7) Specifies that these provisions shall not be construed to require an operator of an Internet Web site, online service, online application, or mobile application to collect age information about users. (BPC 22581(e).)

8) Requires, under the California Online Protection Privacy Act (CalOPPA), that an operator of a commercial website or online service that collects personally identifiable information (PII) through the internet about individual consumers residing in California who use or visit its website or service to conspicuously post its privacy policy on its website, or in the case of an operator of an online service, make that policy available in accordance with specified law. An operator is only deemed to be in violation of CalOPPA if it fails to post its policy within 30 days after being notified of noncompliance. (BPC 22575(a).)

9) The privacy policy required above, must, among other things:
  a) Identify the categories of PII that the operator collects through the website or online service about individual consumers who use or visit its commercial website or online service and the categories of third-party persons or entities with whom the operator may share that PII.
  b) Describe the process by which the operator notifies consumers who use or visit its commercial website or online service of material changes to the operator's privacy policy for that website or online service.
  c) Disclose whether other parties may collect PII about an individual consumer's online activities over time and across different website when a consumer uses the operator's website or service. (BPC 22575(b).)

**FISCAL EFFECT**: Unknown

**COMMENTS**:

1) **Author's statement**: According to the author, "Americans value their privacy, be it in the physical world or online. A 2014 PEW Research Center study found that 91% of adults agree that 'consumers have lost control over how personal information is collected and used by companies.' A subsequent study in 2016 found that "some 74% say it is 'very important' to them that they be in control of who can get information about them, and 65% say it is 'very important' to them to control what information is collected about them. The same study found that 64% of Americans believe that the government should do more to regulate what advertisers do with their personal information. […]
  The recent data breaches that have affected millions of people - those experienced by Target, Equifax, Cambridge Analytica, and many more - have also raised concerns from Internet users around the world. In fact, 'a majority of Americans (64%) have personally experienced a major data breach, and relatively large shares of the public lack trust in key institutions - especially the federal government and social media sites - to protect their personal information.'
  The prevalence of these occurrences and uncertainty about what data is being collected about individuals has drawn the ire of consumer and public interest groups, while the threat of restrictive regulation worries technology companies, many of which are headquartered in California and employ thousands of individuals here."

2) **Bill expands upon rights that initiative would have attempted to establish**: This bill represents a legislative effort to reach an agreement on issues relating to the collection and sale of consumers' PI by businesses, both online and otherwise, that are also the subject of an initiative measure which recently qualified for this November's ballot. As reflected in the bill, this bill only takes effect if the initiative is pulled from consideration from the ballot, which must be done by 5 p.m. on June 28, 2018, through the Secretary of State's office.
  As amended in the Senate, this bill seeks to strike an appropriate balance between a variety of competing interests between consumer and privacy groups on one side and the business, telecommunications, and technology industry on the other. The

Case 8:20-cv-01203-DOC-DFM   Document 148-1   Filed 11/30/20   Page 8 of 16   Page ID #:1112

California Bill Analysis, A.B. 375 Sen., 6/25/2018, California Bill Analysis, A.B. 375...

proponents of the initiative sought to ensure that the privacy rights of Californians were better protected with respect to certain business practices. The industry raised a number of concerns related to the initiative, including issues with workability, and a number of concessions have been made on both sides.

Specifically, this bill seeks to enact the California Consumer Privacy Act of 2018, operative beginning January 1, 2020, to generally ensure a person's right to access their PI; the right to delete PI collected from them; right to know what PI is being collected about them and whether their PI is being sold and to whom; the right to opt-out or opt-in to the sale of their PI, depending on age of the consumer; and the right to equal service and price. In contrast to the initiative, which includes many but not all of those same rights, this bill enhances various consumer rights and protections, by, among other things:

a) Ensuring that consumers can access the PI that business collects about them, not just in terms of the categories of PI collected, but also with respect to the specific pieces of PI that the business has collected. Moreover, if this information is provided electronically, this bill ensures that the information must be in a portable and, to the extent technically feasible, in a readily useable format that allows the consumer to transmit this information to another entity without hindrance.

b) Establishing the right of consumers to request the deletion of the PI that a business has collected from the consumer (as opposed to from other consumers, in order to protect First Amendment rights of those other consumers), subject to certain exceptions.

c) Expanding the right of consumers to know what PI a business has collected about them to include the ability to find out not just the categories of PI collected, but also the *specific pieces* of PI that the business has collected about that consumer. Moreover, this bill grants the consumer a right to know the *sources* from which the PI is collected, as well as the *business or commercial purpose* for collecting or selling the PI.

d) Addressing the PI of children separately from that of parents or guardians, as opposed to classifying all children's information as a subcategory of the parent's PI.

In addition to these items, this bill's provisions differ from the initiative measure by addressing the recent Cambridge Analytica situation head on (wherein the PI of at least 87 million Facebook users was harvested and used by a "third party" in an effort to influence the 2016 U.S. presidential election), and clearly prohibiting third parties from further selling or disclosing information received from a business unless the third party complies with the provisions of this bill.

Staff notes that yet another significant difference between this bill and the initiative is that the "publicly available" exception to PI in this bill excludes language from the initiative which states that publicly available information (and thus, *not* "PI" under the initiative) is information that is "available to the general public." This difference should remove any doubt that information about individuals, and particularly younger generations, that is not privately held, whether by that individual's choice or not (*e.g.*, information found on a person's social media posts or the posts of their friends) is not "publicly available" and, thus, exempt from the definition of PI. To exclude such information from the definition of PI could have significant unintended consequences and could very well result in litigation to determine whether or not certain information is "available to the general public" or not.

3) **Limited private right of action and other changes to the initiative to address industry concerns**: As discussed above, in order to reach a legislative compromise on the issues surrounding the collection and sale of a consumer's PI by a business, the authors of this legislation have sought to both add protections to the initiative, and remove various provisions that raised workability issues/legitimate business practice concerns and otherwise limit liability exposure. The tradeoffs to address industry concerns and counterbalance the consumer rights added within this bill, include the following:

a) The removal of the initiative's whistleblower provisions;

b) A significant reduction of business' liability exposure pursuant to consumer-initiated actions;

c) A right to cure, when possible, both in the public and private enforcement provisions;

d) A limitation of public enforcement to actions by the AG and explicit authorization to receive guidance from the AG on compliance as the single regulatory entity;

e) A recognition of the ability of businesses to engage in various research-related activities, such for internal research and development, or other allowable forms of research with specified safeguards that would both ensure informed consent and better protect the consumers' information used in the research;

f) Additional express exemptions, such as to exercise or defend legal claims, or for PI collected, processed, sold, or disclosed pursuant to certain federal laws, if the handling of the PI is in conflict with that those laws.

Case 8:20-cv-01203-DOC-DFM    Document 148-1    Filed 11/30/20    Page 9 of 16    Page ID #:1113

California Bill Analysis, A.B. 375 Sen., 6/25/2018, California Bill Analysis, A.B. 375...

g) Language clarifying that businesses are not required to retain PI in situations where they would not ordinarily maintain that information (which would also undermine consumer protections);

h) Authorization to engage in certain financial incentive programs, as specified, such as free subscription services in exchange for advertising where the value to the consumer is based on the consumer's data, as long as the financial incentive program is not unjust, unreasonable, coercive, or usurious and is directly related to the value provided to the consumer by the consumer's data;

i) A narrowing of the definition of "sell" to remove reference to situations that do not involve valuable consideration; and

j) Limit the obligation of businesses to reveal to consumers to whom the consumer's PI was collected and shared with, or sold to or disclosed for a business purpose to, to "categories" of third parties, as opposed to specific third parties.

With respect to enforcement specifically, would create a limited private right action for consumers whose information is subject to specified data breaches, and would otherwise generally provide for enforcement of the rights and obligations of the bill by way of public enforcement by the AG. This limitation on the private right of action, however, does not relieve any parties from their duties and obligations under any other law or the constitution. As indicated above, the bill would also recognize the ability of businesses to seek guidance from the AG about how to comply with the provisions of this bill, to ensure a single enforcement/ regulatory entity. To that end, the AG would also be charged with adopting regulations in furtherance of this bill. These regulations would include, among other things, regulations on the financial incentive programs authorized under this bill.

4) **Arguments in support**: In support, the Consumer Attorneys of California writes that this bill will "move California a step forward in protecting Californians' constitutional right to privacy. In the aftermath of the Equifax scandal, Consumer Attorneys of California co-sponsored SB 1121 (Dodd) of the current legislative session in order to incentivize the protection of consumer data and prevent future breaches. Although a much narrower and limited approach, this bill takes a positive step towards protecting consumers' data."

Consumer Watchdog writes in support of this bill because, while "AB 375 is not perfect [… it] is a substantial forward step for privacy protection in California." Specifically, it writes:

AB 375 makes substantial steps toward providing real ways to protect our privacy rights. […] Importantly the bill provides for statutory damages and a right to private action in the event of a data breach. While there are some limits on the private action right, no provision for any private right of action exists in current data breach law. The bill provides business can't deny service because you won't allow information to be sold. They could charge more, but any such charge cannot be: "unjust, unreasonable, coercive or usurious." Also, the difference in price or service must be "directly related to the value provided to the consumer by the consumer's data."

Currently there are no protections that would ensure service if you refuse to have your data sold. Under AB 375, if a charge is levied, it will make the practice transparent so consumers understand what is at stake. Additionally, we expect the attorney general to implement regulations that will protect consumers from predatory practices.

5) **Arguments in opposition**: The California Cable & Telecommunications Association (CCTA) writes in opposition that "AB 375 is overly broad and would impose significant operational costs on businesses without significantly improving privacy for consumers."

Also in opposition, the Media Alliance writes that it opposes "the last minute deal to rush through broadband privacy legislation prior to June 28th in order to remove the California Consumer Privacy Act from the fall ballot. We do this in spite of the fact that we are quite eager and in fact somewhat desperate for the Legislature to act on online privacy." Media Alliance argues that this bill weakens the ballot initiative. Specifically, it raises issue with what it characterizes as "codifying price discrimination for privacy." It also argues in opposition because of the narrowed definition of "sale" which eliminates application of the bill to the transfer any transfer of data for which valuable consideration has *not* been provided. Furthermore, Media Alliance objects to the consumer's limited right of remediation under the narrowed private right of action.

A coalition of businesses and organizations in opposition, led by the California Chamber of Commerce, writes that:

[…] the business community is in an untenable situation. Although AB 375 is deeply flawed, the "privacy initiative" is even worse. The stakes are of this initiative are enormous because if the initiative is passed, then the Legislature will be virtually unable to amend the law in the future. So, at this late hour, we prefer the legislative process to the initiative process, which leaves very little room to amend or update this law for businesses and technology constantly evolving for the betterment of California.

California Bill Analysis, A.B. 375 Sen., 6/25/2018, California Bill Analysis, A.B. 375...

Case 8:20-cv-01203-DOC-DFM    Document 148-1    Filed 11/30/20    Page 10 of 16    Page ID #:1114

The business community has been and remains interested in and dedicated to crafting reasonable privacy legislation. We strongly urge the Legislature to consider the numerous problems presented by this bill and to fix them as we move forward. These include, but are not limited to, the issues surrounding enforcement, definitions of personal information and sale, consumer transparency and access, the right to delete information, certain opt-in rights, the mandated 'opt-out' button, the creation of GDPR-like rights in language that differs from the GDPR, the Attorney General's regulatory process, and confusing language that will be difficult for businesses and consumers to understand.

In recognition of these concerns, this bill includes a delayed implementation of January 1, 2020, to allow for businesses to prepare and for the Legislature to enact clean up legislation to correct errors in the drafting of this legislation, as well as clarify provisions further for stakeholders, if possible. A number of stakeholders have written to identify necessary corrections.

**Analysis Prepared by**: Nichole Rapier and Ronak Daylami / P. & C.P. / (916) 319-2200 FN: 0003627

CA B. An., A.B. 375 Sen., 6/25/2018

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

# FINAL STATEMENT OF REASONS

## UPDATE OF INITIAL STATEMENT OF REASONS

As authorized by Government Code section 11346.9, subdivision (d), the OAG hereby incorporates the Initial Statement of Reasons (ISOR) prepared in this matter. Unless specifically discussed otherwise below, the ISOR's stated bases for the necessity of the proposed regulations continue to apply to the regulations as adopted.

All modifications from the initial proposed text of the regulations are summarized below. All references to regulations are to Title 11 of the California Code of Regulations.

**Changes Made to Article 1.  General Provisions:**

    A.    **11 CCR § 999.301.  Definitions**

**Subsection (a)** has been modified to clarify that the phrase "a child under 13" means a child under 13 "years of age."  This change is necessary to make the language consistent with other age references throughout these regulations.

**Subsection (c)** has been modified to clarify that the phrase "registered with the Secretary of State" means registered with the Secretary of State "to conduct business in California."  This change was made in response to comments stating that it was unclear what kind of registration was required for authorized agents, such as comments asking whether authorized agents were required to register in a separate, CCPA-specific registry managed by the Secretary of State.  The change is necessary to clarify that no CCPA-specific registry exists and to clarify that to be an authorized agent, a business entity must be registered with the Secretary of State to conduct business in California.  Businesses receiving consumer requests through purported authorized agents, consumers, and business entities intending to act as authorized agents benefit from this clarification regarding who may act as authorized agents.

**Subsection (d)** has been modified to provide further guidance and clarification for the definition of "categories of sources," which is used throughout these regulations. (See Sections 999.301, subd. (q)(3), 999.308, subd. (c)(1)(e), 999.313, subd. (c)(10)(b).)  "Categories of sources" has been clarified to mean "types or groupings of persons or entities" from which a business collects consumers' personal information, not just "types of entities."  The definition has also been modified to require a business to describe its categories of sources "with enough particularity to provide consumers with a meaningful understanding of the type of person or entity."  The following examples have also been added to the definition:  advertising networks, internet service providers, data analytics providers, operating systems and platforms, social networks, and data brokers.

These modifications are necessary to provide further guidance to businesses concerning the information they are required to provide to consumers, especially when responding to a request to know.  This additional guidance benefits consumers by ensuring that businesses provide

phrase "reliable method of calculation," without further modification, implied a level of certainty regarding how to calculate the value of a consumer's data that they contended does not currently exist in many industries. The addition of "reasonably" is necessary to avoid this implication.

**Subsection (b)** has been added and states that "[f]or the purpose of calculating the value of consumer data, a business may consider the value to the business of the data of all natural persons in the United States and not just consumers." The initial proposed regulation likewise permitted businesses to consider the value to the business of data from all natural persons in the United States, rather than only California consumers; however, the initial proposed regulation achieved this by defining "typical consumer" as "a natural person residing in the United States" and then permitted consideration of the value of the "typical consumer's data" in the factors now provided in subsection (a). Comments in response to the initial draft of the regulations indicated that the initial formulation was confusing, and thus, the OAG added subsection (b) to state this concept more explicitly. Businesses will benefit from this more straightforward description.

### SUMMARY OF COMMENTS AND DEPARTMENT RESPONSES

The OAG received 209 comment letters during the 45-day comment period, 99 comment letters during the first 15-day comment period, and 68 comment letters during the second 15-day comment period. The summary of the comments and the OAG's responses are attached as the following appendices.

- Appendix A.   Summary and Response to Comments Submitted during 45-Day Period
- Appendix B.   List of Commenters from 45-Day Period
- Appendix C.   Summary and Response to Comments Submitted during 1st 15-Day Period
- Appendix D.   List of Commenters from 1st 15-Day Period
- Appendix E.   Summary and Response to Comments Submitted during 2nd 15-Day Period
- Appendix F.   List of Commenters from 2nd 15-Day Period

For ease of reference, the OAG assigned a number to each written and oral comment submission received. Because most comment letters contained multiple substantive comments that needed to be addressed, for each substantive comment, the OAG assigned subnumbers to the comment submission number. The OAG also added a prefix to denote whether the submission was a written or oral comment—"W" for written and "O" for oral. For oral comments, the "O" is followed by an abbreviation for the location of the hearing. Specifically, "OSac" refers to the Sacramento hearing, "OLA" refers to the Los Angeles hearing, "OSF" refers to the San Francisco hearing, and "OFres" refers to the Fresno hearing. Accordingly, in the OAG's summary and response to comments, the comment number "W15-3" refers to the third substantive comment included in the 15th written comment received, and "OLA14-1" refers to the first substantive point of the 14th commenter at the Los Angeles public hearing.

The "Summary and Response to Comments" is organized according to the chronological order of the proposed regulations that they address. Comments relating to multiple sections of the regulations are grouped together at the beginning of each Article number. Comments generally about the regulations, but not regarding a particular section or subsection of the regulations, are grouped together at the end under the heading of "Other." Subheadings have been included where comments are related to similar topics. Page numbers and transcript references have also been included for ease of reference.

The "List of Commenters" identifies the person and/or entity that submitted the comment during a particular comment period and provides the response number(s) that correspond(s) to the commenter's substantive point(s). It is essentially an index that assists the commenter in locating the OAG's response to their comment, given the extensive number of substantive comments received. In some instances, the commenter's substantive point may have been responded to by multiple response numbers.

## LOCAL MANDATE DETERMINATION

The proposed regulations do not impose any mandate on local agencies or school districts.

## ALTERNATIVES DETERMINATIONS

In accordance with Government Code section 11346.9, subdivision (a)(4), the OAG has determined that no reasonable alternative it considered or that has otherwise been identified and brought to its attention would be more effective in carrying out the purpose for which the action is proposed, or would be as effective and less burdensome to affected private persons than the proposed action, or would be more cost-effective to affected private persons than the proposed action, or would be more cost-effective to affected private persons and equally effective in implementing the statutory policy or other provision of law.

The OAG considered two alternative approaches to the regulations, described in the SRIA and presented below, and determined that they would as effective but more burdensome on businesses, or less burdensome on businesses but less effective in carrying out the purposes for which the regulations are proposed. (SRIA, p. 42.)

More stringent regulatory requirement. A more stringent regulatory alternative considers mandating more prescriptive compliance requirements, including detailed training programs and record-keeping practices for all businesses subject to the CCPA. This requirement would be an additional requirement (beyond the proposed regulations) for potentially hundreds of thousands of California businesses and would impose substantial costs. Even though this approach may be as effective in implementing the CCPA, the OAG rejects this regulatory alternative in order to ease the compliance burden for smaller businesses subject to the CCPA that do not necessarily have the resources to devote additional staff to handle CCPA related tasks.

| Response # | Summary of Comment | Response | Comment #s | Transcript or Bates Label (CCPA_45DAY_) |
|---|---|---|---|---|
| | | the CCPA, which creates new privacy rights for consumers and corresponding obligations on businesses subject to it, with limited, specified exceptions to those rights. | | |
| 912. | Clarify the scope of "exercise or defend legal claims" and the phrase "shall not restrict" in Civ. Code § 1798.145(a), and how transactional legal services fall within that scope.  Does "shall not restrict" mean that a business does not need to comply with § 1798.105  when it is reasonably anticipated that personal information that a consumer requests be deleted may be necessary for the purposes in §1798.145(a)?  Or does it mean that a business must still comply with some parts of the CCPA that are not affected by its efforts toward those purposes? | No change has been made in response to this comment.  The proposed clarification to the CCPA is unnecessary because the CCPA is reasonably clear. Businesses shall comply with the obligations imposed by the CCPA except to the extent necessary for the purposes enumerated in Civ. Code § 1798.145(a); businesses must still comply with obligations imposed by the CCPA that do not restrict their ability to carry out those purposes.  Sections 999.313(c)(5) and 999.313(d)(6)-(7) also provide guidance where a business denies a request to know or request to delete because of an exception to the CCPA.  To the extent that the commenter seeks additional clarity, it likely requires a fact-specific determination.  The commenter should consult with an attorney who is aware of all pertinent facts and relevant compliance concerns. | W198-5 OSF4-2 OSF4-3 | 01639-01640 SF 21:17-22:24 SF 22:25-23:7 |
| 913. | If a service provider deletes personal information in response to a consumer's request, and the consumer subsequently brings action alleging federal regulatory violations that the service provider no longer has evidence to defend because it was deleted, is there anything in the CCPA that protects the service provider? | No change has been made in response to this comment.  Whether or not a service provider can deny a request to delete based on an exception set forth in Civil Code §§ 1798.105(d) or 1798.145  is a fact-specific determination. The OAG does not believe it is necessary to provide a regulation regarding the particular situation raised.  The regulations are meant to apply to a wide-range of factual situations.  To the extent that the commenter seeks additional clarity, the commenter should consult with an attorney who is aware of all pertinent facts and relevant compliance concerns. | W123-10 | 00958 |
| - **Lookback** | | | | |
| 914. | Provide clarification that any enforcement action will be based only on conduct or omissions occurring on or after July 1, 2020 and not on conduct or omissions occurring between the CCPA effective date (January 1, 2020) and June | No change has been made in response to this comment.  The CCPA states that "on or before July 1, 2020,  the Attorney General shall solicit broad public participation and adopt regulations to further the purposes of this title."  Civ. Code § 1798.185(a).   The CCPA provides further that the Attorney General shall not bring | W33-2 W50-6 W57-1 W61-2 W65-1 | 00120 00231-00232 00301-00302 00345 00400-00401 |

**FSOR APPENDIX A:  SUMMARY AND RESPONSE TO COMMENTS SUBMITTED DURING 45-DAY PERIOD**

| Response # | Summary of Comment | Response | Comment #s | Transcript or Bates Label (CCPA_45DAY_) |
|---|---|---|---|---|
|  | 30, 2020, inclusive. (1) Under the plain language of the CCPA, it is ambiguous whether the Attorney General is prohibited from bringing an enforcement action for conduct that occurs prior to July 1, 2020.  (2) The regulations address all the major aspects of the CCPA.  Without having final regulations in place to govern compliance, businesses lack clarity that the solutions they are readying for January 1, 2020, will meet regulatory requirements.  The regulations pose substantial operational obligations that exceed, or conflict with what the CCPA requires with no appreciable consumer benefit.  In addition, California should follow the approach taken by federal agencies in order to provide adequate time to institutions to effectively implement regulatory expectations. | an enforcement action under the CCPA until six months after the publication of the final regulations issued thereunder or July 1, 2020, whichever is sooner. Civ. Code § 1798.185(c).  These sections set forth the provisions regarding the timeline for adoption of regulations and the commencement of enforcement actions under the CCPA and are reasonably clear.  This comment objects to the enforcement discretion granted to OAG under the underlying statute rather than to any specific regulation, or the regulation process.  How the OAG exercises its enforcement discretion under the CCPA is beyond the scope of these regulations. | W68-10 W103-29 W129-1 W130-1 | 00423 00784 01006 01013 |
| 915. | The Attorney General should not bring enforcement actions based on conduct occurring before the effective date of the CCPA, as long as businesses make reasonable efforts to give consumers an understanding of their practices. Since the CCPA's definitions, particularly those of "sale" and "personal information" differ significantly from definitions in other statutes, some businesses may have difficulty ascertaining the precise set of data points they collected or transfers they engaged in that would fit these definitions. | No change has been made in response to this comment.  The Attorney General cannot bring enforcement actions based on conduct occurring before the effective date of the CCPA. | W65-10 | 00404 |
| 916. | Clarify that the 12-month lookback period provided for in § 1798.130 applies from the effective date of the CCPA, which is January 1, 2020.  This change would preclude its application to activities occurring prior to that effective date. | No change has been made in response to this comment.  The comment's proposed change is not consistent with the CCPA. Civ. Code § 1798.198(a) states that the CCPA is operative on January 1, 2020.  Civ. Code § 1798.130 also states that the | W68-8 W70-15 | 00422-00423 00505 |